

ORIGINAL

SEALED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

DEC 1 2 2018

CLERK, U.S. DISTRICT COURT
By _____
        Deputy

UNITED STATES OF AMERICA

v.

RICHARD HALL (01)
SCOTT SCHUSTER (02)
DUSTIN RALL (03)
JOHN LE (04)
GEORGE LOCK PARET (05)
TURNER LUKE ZEUTZIUS (06)
QUINTAN COCKERELL (07)
MICHAEL RANELLE (08)

NO.

**3-18CR-623-S**

**FILED UNDER SEAL**

**INDICTMENT**

The Grand Jury charges:

**General Allegations**

At all times material to this Indictment:

**The Defendants and Related Companies**

1.      The Medicine Store Pharmacy, Inc., dba Rxpress Pharmacy (Rxpress Pharmacy)
and Halls IV & Institutional Pharmacy, Inc., dba Xpress Compounding (Xpress
Compounding), were compounding pharmacies located at 1000 W. Weatherford St., Fort
Worth, Texas.  Rxpress Pharmacy accepted private insurance, and federal health care
benefit programs including TRICARE and FECA.  Xpress Compounding accepted
TRICARE and FECA.

2.      Defendant **Richard Hall**, a resident of Tarrant County, Texas, was an owner and part of the sales and marketing group of Rxpress Pharmacy and Xpress Compounding.

3.      Defendant **Scott Schuster**, a resident of Tarrant County, Texas, was an owner, member of the Board of Directors, and part of the sales and marketing group of Rxpress Pharmacy and Xpress Compounding.  **Schuster** was also an owner of Tactical Health Care Partners, Inc. (THCP).

4.      Defendant **Dustin Rall**, a resident of Tarrant County, Texas, was an owner, member of the Board of Directors, and part of the sales and marketing group of Rxpress Pharmacy and Xpress Compounding.  Rall was also an owner of THCP.

5.      Defendant **John Le**, a resident of Dallas County, Texas, was the Vice President of Finance for Rxpress Pharmacy and Xpress Compounding.  Le was in charge of paying commissions to marketers for both companies.

6.      Defendant **George Lock Paret**, a resident of Tarrant County, Texas was the Pharmacist-In-Charge for Rxpress Pharmacy and a marketer for Rxpress Pharmacy and Xpress Compounding.

7.      Defendant **Turner Luke Zeutzius,** a resident of Llano County, Texas, was a marketer for Rxpress Pharmacy and Xpress Compounding.  Zeutzius was also an owner of THCP.

8.      Defendant **Quintan Cockerell,** a resident of Los Angeles County, Texas, was a marketer for Rxpress Pharmacy and Xpress Compounding, and an owner of QSpine, Inc. Person A received commission payments for the benefit of **Quintan Cockerell**.

9.      Defendant **Michael Ranelle**, a resident of Tarrant County, Texas was a marketer for Rxpress Pharmacy and Xpress Compounding, and an owner of Universal Triumph, LLC.

### Federal Health Care Benefit Programs (Generally)

10.     Title 18, United States Code, Section 24(b) defined a health care benefit program as any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service was provided to any individual and included any individual or entity who provided a medical benefit, item, or service for which payment may be made under the plan or contract.

11.     TRICARE was a health care program of the United States Department of Defense (DoD) Military Health System that provided coverage for DoD beneficiaries worldwide, including active duty service members, National Guard and Reserve members, retirees, their dependents, and survivors.  The Defense Health Agency (DHA), an agency of the DoD, was the military entity responsible for overseeing and administering the TRICARE program.  TRICARE was a "health care benefit program" as defined in 18 U.S.C. § 24(b).  Individuals who received benefits through TRICARE were referred to as TRICARE "beneficiaries."

12.     TRICARE paid for medically necessary services and supplies required in the diagnosis and treatment of illness or injury.  Benefits included specified medical services and supplies provided to eligible beneficiaries from authorized civilian sources, including pharmaceuticals.

13.     The Federal Employees Compensation Act (FECA) provided for payment of workers' compensation benefits to federal employees who suffered an injury, disease, or death in the performance of duty.  To establish a claim for benefits, a medical condition was required to be causally related to a claimed injury, disease, or death.  Benefits were only available while a work-related condition continued.  The benefits under FECA included all necessary medical care, medical supplies and prescription drugs.  The Department of Labor ("DOL") Office of Workers Compensation Program ("OWCP") administered the benefits under FECA.  All claims for the State of Texas were processed in Dallas, Texas.  FECA was a "health care benefit program" as defined in 18 U.S.C. § 24(b).

14.     FECA provided coverage for medically necessary pharmaceuticals to treat symptoms that were the result of a work-related injury when prescribed by a doctor.

**Compound Medications (Generally)**

15.     In general, "compounding" is a practice in which a licensed pharmacist; a licensed physician; or in the case of an outsourcing facility, a person under the supervision of a licensed pharmacist; combines, mixes, or alters ingredients of a drug or multiple drugs to create a drug tailored to the needs of an individual patient.  Compound drugs are not approved by the U.S. Food and Drug Administration ("FDA"); that is, the FDA does not verify the safety, potency, effectiveness, or manufacturing quality of compound drugs.  The Texas State Board of Pharmacy regulates the practice of compounding pharmaceuticals in the State of Texas.

16.     Compound drugs may be prescribed by a physician when an FDA-approved drug does not meet the health needs of a particular patient.  For example, if a patient is allergic to a specific ingredient in an FDA-approved medication, such as a dye or a preservative, a compound drug can be prepared without the substance that triggers the allergic reaction. Compound drugs may also be prescribed when a patient cannot consume a medication by traditional means, such as an elderly patient or child who cannot swallow an FDA-approved pill and needs the drug in a liquid form that is not otherwise available.

## Count One

### Conspiracy to Defraud the United States and Pay and Receive Kickbacks
### (Violation of 18 U.S.C. § 371 (42 U.S.C. § 1320a-7b(b)(1) and (2)))

17.     The Grand Jury re-alleges and incorporates by reference all previous paragraphs as if fully alleged herein.

18.     Between in or around May 2014 and in or around September 2016, the exact dates being unknown to the Grand Jury, in the Dallas Division of the Northern District of Texas and elsewhere, the defendants, **Richard Hall, Scott Schuster, Dustin Rall, John Le, George Lock Paret, Turner Luke Zeutzius, Quintan Cockerell**, and **Michael Ranelle**, did knowingly and willfully combine, conspire, confederate, and agree with others known and unknown to the Grand Jury, to commit certain offenses against the United States, that is,

         a.     to defraud the United States by impairing, impeding, obstructing and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Defense in its administration and oversight of the TRICARE program and the United States Department of Labor in its administration and oversight of the FECA program;

         b.     to violate Title 42, United States Code, Section 1320a-7b(b)(1), by knowingly and willfully soliciting and receiving remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any

item and service for which payment may be made in whole or in part by TRICARE and FECA; and for the purchasing, leasing, ordering, and arranging for and recommending the purchasing, leasing and ordering of any good, item and service for which payment may be made in whole and in part by a federal health care program, that is, TRICARE and FECA; and

      c.     to violate Title 42, United States Code, Section 1320a-7b(b)(2), by knowingly and willfully offering and paying remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by TRICARE and FECA; and for the purchasing, leasing, ordering and arranging for and recommending the purchasing, leasing and ordering of any good, item, and service for which payment may be made in whole and in part by a federal health care program, that is, TRICARE and FECA.

### Purpose of the Conspiracy

19.    It was a purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by paying and receiving kickbacks and bribes in exchange for the referral of TRICARE and FECA beneficiaries for whom Rxpress Pharmacy and Xpress Compounding submitted claims to TRICARE and FECA and by submitting and causing the submission of false claims to TRICARE and FECA for health care benefits.

### Manner and Means of the Conspiracy

20.    The manner and means by which the defendants and their co-conspirators sought to accomplish the object and purpose of the conspiracy included, among other things, the following:

21.    Defendants **Hall, Schuster, Rall, Paret,** and **Le** operated Rxpress Pharmacy and Xpress Compounding to achieve the objective of their scheme to defraud: to unlawfully enrich themselves by paying and receiving kickbacks on claims submitted to federal health care benefit programs and by submitting false claims for reimbursement.

22.    Defendants **Hall, Schuster, Rall, Paret,** and **Le** operated Rxpress Pharmacy and Xpress Compounding out of the same location and with the same employees.  The companies were separate in name only.

23.    Defendants **Hall, Schuster, Rall,** and **Le** employed a vast network of marketers to refer prescriptions so that Rxpress Pharmacy and Xpress Compounding could bill both private and federal insurance programs for referred prescriptions.

24.    Defendants **Hall, Shuster, Rall,** and **Paret** recruited marketers into the scheme.

25.    Defendant **Paret** instructed marketers on how to obtain physician signatures on medically unnecessary prescriptions.  **Paret** then claimed a commission referred to as an "override" on the prescriptions the marketers referred.

26.     Defendant **Paret** authorized the processing of prescriptions from doctors he knew were not seeing patients and for prescriptions he knew were illegitimate in order to receive his "override" for those physicians' prescriptions.

27.     Defendants **Hall**, **Schuster**, and **Rall** instructed employees to register physicians under the marketer who referred the physician to Rxpress Pharmacy and Xpress Compounding so that the marketer would receive a commission on the amount insurance programs reimbursed the pharmacies as a result of the physician's referrals.

28.     Defendants **Hall**, **Schuster**, **Rall**, and **Le** paid marketers as W-2 "employees" of Xpress Compounding for federal prescriptions the marketers referred to the pharmacies. At the same time, Rxpress Pharmacy paid these same marketers as 1099 contractors through shell companies the marketers created for private insurance prescriptions the marketers referred to the pharmacies.

29.     Defendants **Hall**, **Schuster**, **Rall**, and **Le** instructed Xpress Compounding employees not to withhold federal taxes from commission paychecks to W-2 marketers so that the marketers could pay secondary marketers (underneath them in the scheme) with untaxed earnings.

30.     Defendants **Hall**, **Schuster**, **Rall**, **Le**, and **Paret** set up a call center to accept all prescriptions for Rxpress Pharmacy and Xpress Compounding.  **Paret** managed the call center.  Call center employees were directed to send federal insurance prescriptions to Xpress Compounding and private insurance prescriptions to Rxpress Pharmacy for processing and billing.

31.     Defendants **Hall**, **Schuster**, **Rall**, and **Paret** maintained a "do not fill" list for doctors that referred prescriptions when it appeared that the doctor was not seeing patients or the prescriptions otherwise appeared illegitimate.  **Hall** reviewed and monitored suspicious prescriptions.  However, **Hall**, **Schuster**, and **Rall** did not refund payments to insurance companies on prescriptions referred by physicians on the "do not fill" list that were previously filled and did not alert authorities that they were receiving illegitimate prescriptions.

32.     Defendant **Schuster** paid bonuses to employees, including **Paret**, to ensure that all prescription refills were processed.  **Schuster** paid employees cash bonuses each day the pharmacies billed over $1 million.  **Schuster** concealed the bonuses and eventually switched to gift cards instead of cash payments.

33.     Defendant **Paret** and other employees created a prescription pad that allowed the pharmacist to change the ingredients prescribed to more expensive ingredients in order to maximize the reimbursements from insurance programs.  **Paret** then instructed other pharmacists to add these ingredients to the prescriptions in order to increase reimbursement.

34.     Defendants **Schuster**, **Rall**, **Le**, **Ranelle**, and others met at the Hotel ZaZa in Dallas, Texas to discuss targeting TRICARE in order to increase proceeds of the scheme.

35.     Defendant **Schuster** instructed marketers to focus on TRICARE beneficiaries and told them that TRICARE was paying the most for compound creams.

36.     Defendants **Schuster**, **Rall**, and **Zeutzius** operated THCP, a shell company, to receive payments for referring prescriptions for compound creams to Rxpress Pharmacy. THCP marketers registered physicians with both Xpress Compounding and Rxpress Pharmacy.  Defendants **Schuster**, **Rall**, and **Zeutzius** then paid commissions through THCP to these marketers.

37.     Defendant **Cockerell** operated QSpine, LLC (QSpine) a shell company, to receive payments for referring prescriptions for compound creams to Rxpress Pharmacy.  QSpine marketers registered physicians with both Xpress Compounding and Rxpress Pharmacy. Defendant **Cockerell** paid commissions through QSpine to these marketers.  To conceal commissions that Xpress Compounding paid him for prescriptions reimbursed by federal insurance, Defendant **Cockerell** directed Xpress Compounding to direct his commissions to Person A.

38.     Defendant **Ranelle** owned and operated Universal Triumph, LLC (Universal Triumph), a shell company.  Universal Triumph marketers registered physicians with both Xpress Compounding and Rxpress Pharmacy.  Rxpress Pharmacy paid Universal Triumph commissions on compound creams **Ranelle** and his marketers referred to Rxpress Pharmacy.  Defendant **Ranelle** paid commissions through Universal Triumph to these marketers.

39.     To conceal the illegal kickbacks, defendants **Hall**, **Schuster**, **Rall**, and **Le** paid marketers, including defendants **Zeutzius, Ranelle,** and **Cockerell (**through Person A) and others as purported W-2 "employees" of Xpress Compounding when the marketers

referred federal prescriptions.  Defendants **Hall**, **Schuster**, **Rall**, and **Le** knew that these marketers were not bona fide employees of Xpress Compounding.

40.    **Zeutzius**, **Ranelle**, **Cockerell** (through Person A), and other marketers who Xpress Compounding paid as purported W-2 "employees" were not bona fide employees: the marketers had no office space, equipment, or supervisors; they received no direction from Xpress Compounding employees; they did not have federal taxes withheld from their pay; and they did not need to request time off.

41.    From in or around May 2014 through in or around September 2016, Xpress Compounding paid illegal kickbacks in the amount of approximately $4.4 million to **Zeutzius**, $2.6 million to **Ranelle**, and $2.1 million to Person A for the benefit of **Cockerell**.

42.    From in or around May 2014 through in or around September 2016, the exact dates being unknown, Xpress Compounding submitted and caused the submission of over approximately $92 million in claims to federal health care benefit programs for compounded drugs, the vast majority of which were the product of illegal kickbacks.

**Overt Acts**

43.    In furtherance of the conspiracy, and to accomplish its object and purpose, the conspirators committed and caused to be committed, in the Dallas Division of the Northern District of Texas, and elsewhere, the following overt acts; that is, the payments for beneficiary referrals reflected in Counts 2-5 below.

## COUNTS 2-5

### Payment and Receipt of Kickbacks
### (Violations of 42 U.S.C. § 1320a-7b(b)(1) and (2) & 18 U.S.C. § 2)

44.     The Grand Jury re-alleges and incorporates by reference all previous paragraphs as if fully alleged herein.

45.     On or about the dates enumerated in the table below, in the Dallas Division of the Northern District of Texas, and elsewhere, the defendants listed in the table below, aiding and abetting and aided and abetted by others known and unknown to the Grand Jury, did knowingly and willfully offer and pay and did knowingly and willfully solicit and receive, remuneration, that is, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by direct deposit and check as set forth below, in return for referring an individual for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part under a Federal health care program, that is, TRICARE and FECA; and for the purchasing, leasing, ordering, and arranging for, and recommending the purchasing, leasing, ordering, and arranging for any good, facility, service, and item for which payment may be made in whole or in part under a Federal health care program, that is, TRICARE and FECA, as set forth below:

| Count | Defendants | Approximate Date | Approximate Amount | Description of the Payment |
|---|---|---|---|---|
| 2 | Richard Hall Scott Schuster Dustin Rall John Le Turner Luke Zeutzius | February 13, 2015 | $1,331.16 | Direct Deposit Voucher 963095DD in the amount of $396,175.64 drawn on the account of Halls IV + Institutional Pharmacy made payable to **Turner Zeutzius** |
| 3 | Richard Hall Scott Schuster Dustin Rall John Le Turner Luke Zeutzius | March 13, 2015 | $2,133.31 | Direct Deposit Voucher 963095DD in the amount of $396,175.64 drawn on the account of Halls IV + Institutional Pharmacy made payable to **Turner Zeutzius** |
| 4 | Richard Hall Scott Schuster Dustin Rall John Le Quintan Cockerell | May 18, 2015 | $7,100.78 | Direct Deposit Voucher 5262996DD in the amount of $694,981.37 drawn on the account of Halls IV + Institutional Pharmacy made payable to Person A, for the benefit of **Quintan Cockerell** |
| 5 | Richard Hall Scott Schuster Dustin Rall John Le Michael Ranelle | February 13, 2015 | $6,664.10 | Direct Deposit Voucher 936070DD in the amount of $230,446.59 drawn on the account of Halls IV + Institutional Pharmacy made payable to **Michael Ranelle** |

All in violation of Title 42, United States Code, Section 1320a-7b(b)(1) and (2), and Title 18, United States Code, Section 2.

### Forfeiture Notice
### (18 U.S.C. § 982(a)(7) and 28 U.S.C. § 2461(c))

46.     Pursuant to 18 U.S.C. § 982(a)(7), and 28 U.S.C. 2461(c), upon conviction of Count One, the defendants, **Richard Hall**, **Scott Schuster**, **Dustin Rall**, **John Le**, **George Lock Paret**, **Turner Luke Zeutzius**, **Quintan Cockerell**, and **Michael Ranelle**, shall forfeit to the United States, any property, real or personal, which constitutes or is derived from proceeds traceable to Count One.

47.     Gross proceeds in an amount of at least $56 million and the defendants are notified that upon conviction, a money judgment may be imposed equal to said amount. Pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), if any of the property described above, as a result of any act or omission of the defendant:

   a.     cannot be located upon the exercise of due diligence;

   b.     has been transferred or sold to, or deposited with, a third party;

   c.     has been placed beyond the jurisdiction of the court;

   d.     has been substantially diminished in value; or

   e.     has been commingled with other property which cannot be divided without difficulty,

the United States intends to seek forfeiture of any other property of the defendant up to the total value of the forfeitable property described above.

A TRUE BILL.

FOREPERSON

TANYA PIERCE
ATTORNEY FOR THE UNITED STATES,
ACTING UNDER AUTHORITY
CONFERRED BY 28 U.S.C. § 515

ADRIENNE E. FRAZIOR
Assistant Chief
Fraud Section, Criminal Division
U.S. Department of Justice
Texas State Bar No. 24059546
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:   202-316-0646
Facsimile:   214-659-8805
Email:       adrienne.frazior2@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

---

THE UNITED STATES OF AMERICA

v.

RICHARD HALL (01)
SCOTT SCHUSTER (02)
DUSTIN RALL (03)
JOHN LE (04)
GEORGE LOCK PARET (05)
TURNER LUKE ZEUTZIUS (06)
QUINTAN COCKERELL (07)
MICHAEL RANELLE (08)

---

INDICTMENT

18 U.S.C. § 371
Conspiracy to Pay and Receive Kickbacks
(Counts 1)

42 U.S.C. § 1320a-7b(b)(1) and (2) & 18 U.S.C. § 2
Payment and Receipt of Kickbacks
(Counts 2 through 5)

18 U.S.C. §982(a) (7) and 28 U.S.C. §2461 (c))
Forfeiture Notice

5 Counts

---

A true bill rendered

------------------------------------------------------------

FORT WORTH                                    FOREPERSON

Filed in open court this 12th day of December, 2018.

------------------------------------------------------------

**Warrant to be Issued**

------------------------------------------------------------

UNITED STATES MAGISTRATE JUDGE
No Criminal Matter Pending