**EXHIBIT B**

## AFFIDAVIT IN SUPPORT OF
## AN APPLICTION FOR A SEARCH WARRANT

1.      I, Joseph McCardel (Affiant), being duly sworn, depose and state as follows:

### AFFIANT EXPERIENCE AND EMPLOYMENT

2.      I am a Special Agent for the United States Department of Defense (DoD), Defense

Criminal Investigative Service (DCIS), Arlington, Texas.  I have been a Special Agent for

approximately 18 years.  By virtue of my employment with DCIS, I am classified, trained

and employed as a Federal law enforcement officer with statutory arrest authority, charged

with conducting criminal investigations of alleged violations of Federal criminal statutes.

3.      I am a graduate of the Criminal Investigator Training Program at the Federal Law

Enforcement Training Center in Glynco, Georgia.   During this program, I received

instruction in constitutional and statutory laws and all phases of basic criminal

investigation to include the execution of search and seizure warrants.  My duties as a DCIS

Special Agent include investigating offenses including, but not limited to: Title 18 United

States Code Sections 1347 (Health Care Fraud), 1349 (Conspiracy to Commit Health Care

Fraud), and 1343 (Wire Fraud).

4.      Prior to becoming a Special Agent with DCIS, I was a Financial Analyst with the

Federal Bureau of Investigation for approximately four years.  Specifically, I was assigned

to the Dallas Field Office and routinely worked with Special Agents in support of a variety

of complex fraud investigations by analyzing business records, accounting records, and

other documents kept in the normal course of business.  Additionally, I have obtained a

Bachelor of Science in Communications from the University of Texas at Arlington.

5.     As a result of my training and experience, I am familiar with business practices used by individuals in the healthcare industry, including documents used in and maintained by healthcare providers in the administration of medicine as well as in the ordinary course of business.

6.     I am being assisted in this investigation by the Federal Bureau of Investigation (FBI), Health and Human Services, Office of Inspector General (HHS-OIG), Department of Labor, Office of Inspector General ("DOL-OIG"), and Veterans Affairs, Office of Inspector General ("VA-OIG"),

## PLACE TO BE SEARCHED

7.     This affidavit is submitted in support of the Government's application for a search warrant for Rxpress Pharmacy, Tactical Health Care Partners, and Xpress Compounding all located at 1000 W. Weatherford St., Fort Worth, TX 76102 in multiple comingled suites, (hereinafter referred to as the **"Target Location"**), more specifically described in Attachment A.  This affidavit is made in support of an application for a search warrant for items further described in Attachment B.

8.     According to the State of Texas, Secretary of State, public records "RxPress" is The Medicine Store Pharmacy, doing business as Rxpress Pharmacy (Rxpress).  Rxpress is registered to Richard A. Hall, Hall's Family Trust, Dustin Rall, and Scott Schuster and has a registered address of 1000 W. Weatherford St., Fort Worth, Texas.  According to the Texas State Board of Pharmacy, Rxpress is located at 1000 W. Weatherford, St. Suite 200, Fort Worth, Texas.  According to UMB Bank records held in the name of the Medicine

Store, Inc. d/b/a Rxpress Pharmacy, the physical address of Rxpress Pharmacy is 1000 W. Weatherford St., Fort Worth, Texas.

9.      According to UMB Bank records held in the name of Tactical Health Care Partners, Inc. obtained during the course of the investigation, the physical address for Tactical Health Care Partners, Inc. is 1000 W. Weatherford St., Fort Worth, Texas.

10.     According to the State of Texas, Secretary of State records, Xpress Compounding is the assumed name of Halls IV Institutional Pharmacy Inc.   Xpress Compounding is registered to Lewis Hall, Jr.   According to the Texas State Pharmacy Board, Xpress Compounding has a physical address of 1000 W. Weatherford St., Suite 120, Fort Worth, Texas.

11.     According to the State of Texas, Secretary of State, and other public records sources Tiger Racing Team, LLC (TRT) is registered to Britt Hawrylak, Matthew Hawrylak, and Ray Hawrylak.  TRT is registered to 4725 Harley Avenue, Fort Worth, TX, 76107.

## PURPOSE OF SEARCH WARRANT

12.     Based on my investigation into Rxpress Pharmacy, Tactical Health Care Partners, Xpress Compounding, and Tiger Racing Team it is my belief that the owners and employees of these entities are engaged in violations of criminal law, including violations of Title 18 United States Code, Sections 1343 (Wire Fraud); 1347 (Health Care Fraud), 1035 (False Statements Related to Health Care Matters); and Title 42 United States Code, Section 1320a-7b (Receipt or Payment of Kickback).

13.     For the reasons set forth in the affidavit, there is probable cause to believe that at the **Target Location** there are documents and items that are evidence of a crime, fruits of

3

a crime, or other items illegally possessed or property designed for use, intended for use or used in a crime in violation of the statutes referenced above.

14.     The facts supporting this affidavit are based on my investigation, discussing this investigation with other Federal law enforcement officers, and my training and experience as a DCIS Special Agent. Because this affidavit is being written for the limited purpose of setting forth probable cause for a search warrant, it does not include every fact learned during the course of this investigation.

## BACKGROUND ON COMPOUND DRUGS AND HEALTH CARE PROGRAMS

15.     Compound drugs, which require a prescription from a doctor, are prepared by a pharmacist who mixes or adjusts drug ingredients to customize a medication to meet a patient's individual needs. In many cases, the compound drugs are in a cream form which the patient can apply topically to the affected areas. Compound drugs are typically prescribed as a multi-biotic (multi-vitamin) or to treat pain or scarring. The costs of such drugs are dependent on the ingredients mixed into the compound.

16.     The TRICARE Program, formerly referred to as the Civilian Health and Medical Plan for the Uniformed Services ("CHAMPUS"), is a Federally funded, statutory health benefits entitlement program for members of the Uniformed Services, family members, spouses and children of active duty uniformed services personnel, retirees and their spouse and dependent children, and spouses and children of deceased retired uniformed services personnel. The rules and regulations that govern TRICARE are contained in the Code of Federal Regulation, Part 32, Section 199.

17.     TRICARE, through 32 CFR § 199, defines the scope of benefits as subject to all applicable definitions, conditions, limitations, or exclusions specified in the regulations. The CHAMPUS Basic Program will pay for medically necessary services and supplies required in the diagnosis and treatment of illness or injury.  Benefits include specified medical services and supplies provided to eligible beneficiaries from authorized civilian sources such as prescription drugs and laboratory testing.

18.     To receive reimbursement for services rendered to health care benefit program beneficiaries, TRICARE requires providers to submit claim forms with, among other things, the patient name, the diagnosis(s), the treatment(s) or services(s) rendered, the date of the treatment(s) and/or service(s), all of which are required to accurately reflect the services rendered to the beneficiary.  Upon receipt of the provider's bill, TRICARE, using Fiscal Intermediaries (FIs), determines whether the claim is covered and the amount of reimbursement that will be allowed.  After calculating the allowable rate, TRICARE pays the provider a portion of the allowable rate for services rendered.

19.     TRICARE, through paragraph (a)(12) of 32 CFR 199.6, requires that the provider of any services rendered to TRICARE beneficiaries be specified on the claim form. Paragraph (a)(12) states:  "CHAMPUS-authorized provider organizations and individuals providing clinical services shall maintain adequate clinical records to substantiate that specific care was actually furnished, was medically necessary, and appropriate, and identify(ies) the individual(s) who provided the care."  The claim form is sent to TRICARE for reimbursement for services rendered by the claimant.

20.     Express Scripts, Inc. (ESI) is the current contractor for TRICARE pharmaceutical claims, which includes compound prescriptions.  Like the FI, ESI must process TRICARE claims and provide health care services to eligible TRICARE beneficiaries in accordance with provisions of their contract as well as regulations and instructions issued by the DoD in administration of the Program.  TRICARE FIs are reimbursed for the adjudication and payment of TRICARE claims at a rate (generally fixed-price) prescribed in their contracts.

21.     According to TRICARE Policy Manual 6010.60-M, Telemental Health or Telemedicine is not a substitute for face-to-face behavioral health care.  TRICARE policy mandates the use of video technology components meeting or exceeding American Telemedicine Association standards.  As a condition of payment TRICARE mandates audio and video telecommunications must be used in which the patient is present and participating.  Telemedicine services originating from a patient's home are not covered.

22.     Rxpress is an enrolled provider in the TRICARE program.  The investigation has revealed Rxpress has submitted claims resulting in TRICARE payments of $597,970 since January of 2013.

23.     Xpress Compounding is an enrolled provider in the TRICARE program.  The investigation revealed Xpress Compounding has submitted claims resulting in TRICARE payments of $55,759,549 since July of 2014.

## FACTS SETTING FORTH PROBABLE CAUSE

### Payments to Marketers for Compound Prescriptions

24. On or about August 18, 2015, Special Agent (SA) Joan Piro and SA Adam Dennick interviewed Ryan Rafols, who is a retired U.S. Army Staff Sergeant currently receiving TRICARE benefits. Rafols stated he corresponded with his friend Malorie Wakefield on Facebook about how Wakefield's fiancé, Eric Twigg, had a way for Rafols to make extra money through his TRICARE benefits. Wakefield stated in her post her fiancé worked with "Rxpress."

25. On or about September 25, 2015, SA Leticia Goodman and SA Adam Dennick interviewed Eric Twigg, who stated he was currently engaged to Malorie Wakefield. Twigg stated he worked as a "Pharmaceutical Representative" with Britt Hawrylak. Twigg stated his role was to find TRICARE beneficiaries and have them agree to try pain and scar creams at no cost to the beneficiary. Twigg provided the beneficiary with a preprinted prescription sheet for the beneficiary's physician to sign. The sheet was then faxed to "Rxpress," who filled the prescription and mailed it to the beneficiary. Twigg was paid approximately $1,000 to $2,000 for each patient, for each month a beneficiary had a prescription filled though Rxpress. Twigg stated about $500 of what he was paid would be split with the beneficiary. Twigg received checks monthly. The checks Twigg received were drawn on a Liberty Bank account belonging to "Tiger Racing."

26. The investigation revealed since 2013, Tiger Racing Team (TRT) has paid approximately 34 individuals and entities through its Liberty Bank account using the annotation "1099 RX" on the memo line. According to bank records and other sources

7

obtained through the course of this investigation, hawrylak21@aol.com was a listed email address and 4725 Harley Ave., Fort Worth, TX 76107 was the listed address for Liberty Bank accounts held in the name of TRT.

27.    From my experience and training, I know "1099" to represent the IRS Form 1099 that is used for tax purposes to report amounts paid to individuals for services rendered and "RX" as a short-hand form to represent prescriptions.

28.    During the course of the investigation, agents obtained documents from Liberty Bank regarding TRT which indicate that TRT entered into an agreement with "Tactical Health Care Partners Inc." The agreement stipulated TRT would be paid 40% of "Net Commissionable Revenue" for completed sales sent through Xpress Compounding and Rxpress.

29.    According to bank records and information obtained during the course of the investigation, Tactical Health Care Partners, Inc. (THCP) has the same registered address as Rxpress which is the **Target Location**.

30.    On or about August 9th and 10th of 2016, Britt Hawrylak was interviewed by SA Adam Dennick. Britt stated he learned about pharmaceutical sales and Rxpress through Lock Paret, a friend of his brother Matt Hawrylak. Paret was the head pharmacist at Rxpress. Britt stated Paret provided him with a blank script pad to give to patients to have their doctor sign and fax to Rxpress. Paret told Britt he would be paid for those prescriptions he referred to Rxpress, including Britt's own prescriptions. Initially, Paret paid Britt in cash and then switched to checks. Paret would put a notation in the memo line, such as "Miami Boat Show," to disguise the reason for the payment. Once Britt sent

enough referrals to Rxpress, Paret asked Scott Schuster (an owner of Rxpress) to make Britt a representative so that he could be paid directly from the pharmacy. Schuster approved and Paret continued to receive a percentage of all of Britt's referrals to Rxpress.

31.    Britt stated he was required to be paid as a W2 employee though he was never an "employee." In order to avoid the tax burden associated with Britt's payments to beneficiaries and marketers working under him, Britt had Rxpress stop withholding Federal taxes from his payments. Britt then sent 1099s to the marketers he paid.

32.    Britt stated TRT was formed to receive and make payments related to Rxpress referrals. Britt recruited his uncle, Jerry Hawrylak, based on Jerry's relationship with a podiatrist, Brian Carpenter, D.P.M. Britt stated Dr. Carpenter was brought in to sign TRICARE prescriptions. Britt would provide the beneficiary information to Jerry who then relayed the information to Dr. Carpenter. Dr. Carpenter would sign the prescription and forward it to Rxpress. Britt admitted to providing Jerry approximately $10,000 cash that was to be given to Dr. Carpenter for signing the prescriptions. Britt also admitted to paying an individual named Nicholas Morano for Morano's prescriptions as well as other beneficiaries referred to Rxpress by Morano.

33.    On or about August 18, 2016, Matt Hawrylak was interviewed by SA Adam Dennick and myself. Matt was also a marketer for Rxpress and visited the **Target Location** on many occasions. Matt stated at one point while at Rxpress, Schuster asked Matt if he was aware of TRICARE and told Matt "you can make a shitload of money" with TRICARE. On another occasion, Matt recalled Richard Hall telling him "TRICARE is paying off for you guys" which Matt stated referenced the amount of money they were paid

9

by Rxpress related to the TRICARE prescription referrals to Rxpress. Matt stated each month he would receive a report that was generated from a "portal" which would document every prescription he referred to Rxpress along with the amount that was reimbursed minus cost of goods sold. Matt stated the "portal" was accessible online. He stated Lynn Brown would email the report to Matt@bullmack.com each month.

## Referrals by Doctors to Rxpress Pharmacy for Compound Prescriptions

### Jess Legg, D.D.S.

34.    According to the Texas State Board of Dental Examiners, Jess Legg, D.D.S. is a licensed dentist with a registered location in Conroe, Texas which is near Houston, Texas.

35.    On or about January 28, 2016, Chester and Michelle Ruffin., husband and wife, were interviewed by SA Adam Dennick and myself. Chester and Michelle Ruffin stated they received pills from Rxpress who mailed them directly to their house in Killeen, TX. They were referred the pills by a family friend, Rick House, and never saw a doctor. Chester and Michelle Ruffin stated they have never heard of Jess Legg, D.D.S.

36.    According to TRICARE claims records, Chester and Michelle Ruffin received multiple prescriptions sent from Xpress Compounding which were all signed by Jess Legg, D.D.S.

37.    On or about May 16, 2016, Helen Veal and her daughter, Linda Summers, were interviewed by SA Adam Dennick and myself. Veal stated her daughter handled her medical affairs since suffering a stroke. Summers stated Veal never visited Jess Legg, D.D.S. However, Summers's husband and a friend received compounded vitamins that

were sent to Summers's residence. The pills were Veal's but were used by Summers and her Summers's husband instead.

38.     According to TRICARE claims records, Veal received 8 prescriptions from Xpress Compounding totaling $41,961 paid by TRICARE. All the prescriptions were signed by Jess Legg, D.D.S.

39.     On or about May 16, 2016, Timothy McBroom was interviewed by SA Adam Dennick and myself. McBroom stated he works for JH Medical Solutions and is paid commissions for each prescription he refers. He referred to the prescriptions as "topical creams." McBroom stated his prescriptions were sent from Rxpress in Fort Worth, TX. He also worked for a company named "MedReps." McBroom stated his medical consultation was done over the phone with Jess Legg, D.D.S. who he believes was a doctor in Waco, TX.

40.     According to TRICARE claims records, McBroom received 6 prescriptions from Xpress Compounding totaling $31,064 paid by TRICARE. All of the prescriptions were signed by Jess Legg, D.D.S.

41.     On or about May 25, 2016, Charlie Rose was interviewed by SA Adam Dennick and myself. Rose stated he was the President of the Special Forces Association, Chapter 15, Headquartered Fort Bragg, NC. Rose was approached by an individual who was interested in speaking to this group about a new drug he could provide to them. For every member that signed up, this individual would make a $100 donation to the group's scholarship fund. Rose stated several members signed up and were sent vitamins from

11

Xpress Compounding, including himself. Rose stated no one ever saw a doctor but filled out a "doctor form."

42.    According to TRICARE claims records, Rose received 5 prescriptions from Xpress Compounding totaling $26,007 paid by TRICARE. All these prescriptions were signed by Jess Legg, D.D.S.

**James Gardner, M.D.**

43.    According to the Texas Medical Board, James Gardner, M.D. is a licensed physician in the State of Texas with a specialty of Family Practice and Emergency Medical Services. He has a registered location of San Antonio, TX.

44.    On or about April 28, 2016, Daniel La Plante was interviewed by SA William Ricci of the Federal Bureau of Investigation, Collierville, TN. La Plante stated he learned about compounded creams from friends, Taylor Lewallen and Dave Pendergrass. La Plante stated Pendergrass was involved with the sale of pharmaceutical creams. La Plante was contacted by a doctor via telephone to inquire about "aches and pains." La Plante was not familiar with the name James Gardner, M.D. La Plante received a $50 gift card for trying the creams. La Plante's prescriptions had the address 7309 74th Street, Lubbock, TX annotated on the bottles. La Plante is not familiar with this address and stated the prescriptions were mailed to his residence in Tennessee.

45.    According to TRICARE claims records, La Plante received 10 prescriptions from Xpress Compounding totaling $83,255 paid by TRICARE. All the prescriptions were signed by James Gardner, M.D.

**Craig Henry, M.D.**

46.     According to the Texas Medical Board, Craig Henry, M.D. is a licensed physician in the State of Texas with a specialty of internal medicine.  He has a registered location of Arlington, Texas.

47.     On June 6, 2016, Norbert Foley was interviewed by SA Ashley Schroer of the FBI in Denver, CO.  Foley stated he was contacted by his commanding officer and close friend, John Diggs, about compounded creams he could use and then get paid to review.  Foley stated he was initially contacted by a pharmacy called Prime Pharmacy Solutions in Slidell, Louisiana which would supply all the medications.  Foley stated all the medications were mailed to his sister's residence.  Foley stated he received approximately $300 to $400 on two occasions from Diggs for using the creams.  Foley responded to emails and text messages asking about the product's effectiveness.  Foley stated he was paid via Walmart wire transfers and direct deposits into his bank account from Diggs.  Foley stated Diggs was using the money received for living expenses while attending law school.  Foley stated he has never heard of Craig Henry, M.D. and never saw any physician related to these prescriptions.

48.     According to TRICARE claims records, Foley received 27 prescriptions from Xpress Compounding totaling $206,148 paid by TRICARE and 4 prescriptions from Prime totaling $43,262 paid by TRICARE.  All the prescriptions were signed by Craig Henry, M.D.

49.     On July 20, 2016, John Diggs was interviewed by SA Carlos Prieto and SA Adam Dennick at his residence in Grand Prairie, TX.  Diggs stated his primary care physician is

13

Craig Henry, M.D. Diggs added he was enrolled in a program called MDVIP which enabled him to call or text Henry for same day visits for any medical needs. The cost to be enrolled in this program was $1,600 a year. Diggs added he was informed of this program by his friend Neil Patel. Because Diggs received compounded cream prescriptions, Patel paid the $1,600 enrollment fee in the MDVIP program. Patel also stated if Diggs referred any other TRICARE beneficiaries, Diggs would receive "commissions" for those referrals. Diggs stated he received approximately $200,000 in "commissions" for referrals, including his own prescriptions. Diggs stated he paid TRICARE beneficiaries he referred to the program for participating and receiving the prescription compounded creams. Diggs provided a "1099 Independent Contractor Main Representative Agreement" between RxConsultants, located at 1132 Glade Road, Colleyville, TX 76034, and Diggs. The agreement stated Diggs was paid 10% of "net reimbursable dollar amount minus cost of goods" for prescriptions Diggs has "personally registered".

50.     According to TRICARE records, Diggs received 32 prescriptions from Xpress Compounding totaling $212,308 paid by TRICARE and 15 prescriptions from Prime totaling $268,889 paid by TRICARE. All the prescriptions were signed by Craig Henry, M.D.

**Brian Carpenter, M.D.**

51.     According to the Texas Medical Board, Brian Carpenter, D.P.M is a licensed in the State of Texas to practice Podiatry.

14

52.     On or about January 27, 2016, Timothy Matthews was interviewed by SA Adam Dennick and myself.  Matthews stated he was referred to Rxpress by his girlfriend, Ashley Gomes, who worked for a man named Tony Timmons.  Timmons held a meeting with Matthews and several members of Matthew's U.S. Army Company.  Timmons bought dinner and signed up Matthews to receive the prescriptions.  Matthews received a gift card he valued at approximately $50 for receiving the prescriptions.  Matthews recalled the name "Dr. Carpenter" but did not recall seeing any podiatrist.

53.     According to TRICARE claims records, Matthews received 6 prescriptions from Xpress Compounding totaling $54,609 paid by TRICARE.  All the prescriptions were signed by Dr. Carpenter.

54.     On or about May 11, 2016, James and Shirley Horan, husband and wife, were interviewed by myself.  James Horan was referred to Rxpress by a friend of Shirley Horan. James Horan was asked to participate in a "study" involving the compound creams.  Both James and Shirley Horan spoke with Dr. Carpenter over the telephone but never met in person.  Both received $1,000 for participating in the "study."

55.     According to TRICARE claims records, James Horan received 11 prescriptions from Xpress Compounding totaling $87,404 paid by TRICARE and Shirley Horan received 11 prescriptions from Xpress Compounding totaling $85,265 paid by TRICARE.

56.     On or about May 24, 2016, Nicholas Morano was interviewed by SA Adam Dennick.  Morano stated he spoke with Dr. Carpenter over the telephone to get his prescriptions.  Morano stated he did not receive payment of any kind in relation to these medications.

57.   According to TRICARE claims records, Morano received 15 prescriptions from Xpress Compounding totaling $142,163 paid by TRICARE.  All the prescriptions were signed by Carpenter.  According to bank records obtained through the course of this investigation, it was determined Morano received $47,439 in payments from Britt Hawrylak.

## PROBABLE CAUSE THAT EVIDENCE OF CRIMES EXISTS AT TARGET LOCATION

58.   Based on my training and experience, I know it is a common business practice to store business documents and records at the physical location of the business.  Business records and documents are commonly stored on electronic devices such as computers or tablets.  Further, it is customary to conduct business through mobile computing devices, such as cellular smart phones, via electronic mail, text messages, or voice calling.

59.   Title 22 of the Texas Administrative Code addresses licensing standards for community pharmacies.  Section 291.34 of this title requires pharmacies to maintain original prescriptions in numerical order for a period of two (2) years at the pharmacy's licensed location.  Rxpress has identified itself as a Class A community pharmacy on marketing materials.

60.   According to the Texas State Board of Pharmacy's license verification website, the current location for Rxpress Pharmacy is 1000 W. Weatherford St., Suite 200, Fort Worth, TX, which is the **Target Location**.

61.   In his August 18, 2016 interview, Matt Hawrylak told me that Rxpress utilized a portal to store patient and marketer information and from which marketing fee reports were

16

generated. Matt Hawrylak told agents that reports are generated and discussed in weekly leadership meetings at Rxpress Pharmacy at the **Target Location**. These reports are used at the meetings in printed form but are also emailed to marketers.

62.     On September 7, 2016, I conducted surveillance at the **Target Location**. I entered the open pharmacy as any customer would and visually confirmed it is in operation and operating as a pharmacy. Although the pharmacy is closed to the public and requires an individual to approve entry, I was able to verify that the address was 1000 W. Weatherford St. In addition, I observed paperwork, computers, and other items commonly associated with an operating pharmacy.

63.     On September 7, 2016, Matt Hawrylak was interviewed by myself. Matt stated that the last time he was inside the **Target Location** was January of 2016. Matt stated that the entire building located at 1000 W. Weatherford is utilized for Rxpress Pharmacy, Xpress Compounding, and Tactical Healthcare Partners. Matt stated that the first floor contains business operations while the second floor contains the offices of Scott Schuester, Lewis Hall, Richard Hall, Dustin Rall, and Lock Paret, and a conference room.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

64.     As described above and in Attachment B, this application seeks permission to search for records that might be found at the **Target Location**, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

65.     I submit that if a computer or storage medium is found at the **Target Location**
there is probable cause to believe those records will be stored on that computer or storage
medium, for at least the following reasons:

    a.  Based on my knowledge, training, and experience, I know that computer files
or remnants of such files can be recovered months or even years after they
have been downloaded onto a storage medium, deleted, or viewed via the
Internet.  Electronic files downloaded to a storage medium can be stored for
years at little or no cost.  Even when files have been deleted, they can be
recovered months or years later using forensic tools.  This is so because when a
person "deletes" a file on a computer, the data contained in the file does not
actually disappear; rather, that data remains on the storage medium until it is
overwritten by new data.

    b.  Therefore, deleted files, or remnants of deleted files, may reside in free space
or slack space—that is, in space on the storage medium that is not currently
being used by an active file—for long periods of time before they are
overwritten.  In addition, a computer's operating system may also keep a
record of deleted data in a "swap" or "recovery" file.

    c.  Wholly apart from user-generated files, computer storage media—in particular,
computers' internal hard drives—contain electronic evidence of how a
computer has been used, what it has been used for, and who has used it.  To
give a few examples, this forensic evidence can take the form of operating

system configurations, artifacts from operating system or application operation,

file system data structures, and virtual memory "swap" or paging files.

Computer users typically do not erase or delete this evidence, because special

software is typically required for that task.  However, it is technically possible

to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes

automatically downloaded into a temporary Internet directory or "cache."

e.  Based on actual inspection of other evidence related to this investigation,

specifically the marketing reports referenced above, I am aware that computer

equipment was used to generate, store, and print documents used in the health

care fraud and kickback scheme.  There is reason to believe that there is a

computer system currently located at the **Target Location**.

66.     As further described in Attachment B, this application seeks permission to locate

not only computer files that might serve as direct evidence of the crimes described on the

warrant, but also for forensic electronic evidence that establishes how computers were

used, the purpose of their use, who used them, and when. There is probable cause to

believe that this forensic electronic evidence will be on any storage medium at the **Target**

**Location** because:

a.  Data on the storage medium can provide evidence of a file that was once on the

storage medium but has since been deleted or edited, or of a deleted portion of

a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is

20

analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the

21

computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

67.   In most cases, a thorough search of a premise for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store

23

a large volume of information.  Reviewing that information for things
described in the warrant can take weeks or months, depending on the volume
of data stored, and would be impractical and invasive to attempt on-site.

b.  Technical requirements.  Computers can be configured in several different
ways, featuring a variety of different operating systems, application software,
and configurations.  Therefore, searching them sometimes requires tools or
knowledge that might not be present on the search site.  The vast array of
computer hardware and software available makes it difficult to know before a
search what tools or knowledge will be required to analyze the system and its
data on the Premises.  However, taking the storage media off-site and
reviewing it in a controlled environment will allow its examination with the
proper tools and knowledge.

c.  Variety of forms of electronic media.  Records sought under this warrant could
be stored in a variety of storage media formats that may require off-site
reviewing with specialized forensic tools.

68.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am
applying for would permit seizing, imaging, or otherwise copying storage media that
reasonably appear to contain some or all of the evidence described in the warrant, and
would authorize a later review of the media or information consistent with the warrant.
The later review may require techniques, including but not limited to computer-assisted

scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

69.     Based on my training, experience, and participation in the investigation, as well as statements made to me by other Federal law enforcement officers I believe probable cause exists to believe that evidence of these crimes are located inside the **Target Location** which is further described in Attachment A.

Respectfully Submitted,

Joseph McCardel
Special Agent
Dallas Residency Agency
Defense Criminal Investigative Service

Subscribed and sworn to before me on the 8th day of September, 2016.

PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

25